## Edgewood Borough School District Appeal.

Argued November 12, 1970; reargued March 8, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

Robert A. Rundle, with him J. Thomas Menaker, Norman I. White, Wright & Rundle, and McNees, Wallace & Nurick, for appellant.

John D. Killian, with him John R. Smith, Patrick H. Washington, John B. Nicklas, Jr., and Joseph U. Esper, for appellee.

OPINION PER CURIAM, April 16, 1971:
Order affirmed.

———

DISSENTING OPINION BY MONTGOMERY, J.:

This is one of nine appeals by various school districts from the orders of the Court of Common Pleas of Allegheny County, which reviewed the adjudications by the State Board of Education of a plan of school district reorganization for Allegheny County formulated by the Allegheny County Board of School Directors pursuant to the Pennsylvania School Reorganization Act of July 8, 1968, P. L.     , 24 P.S. §2400.1 (Act 150). All of these cases were argued before this Court on November 12, 1970, and all appeals were affirmed by our per curiam orders of December 30, 1970.[1] In this one case the School District of the Borough of Edgewood, intervenor-appellant (Edgewood), petitioned for reargument, requesting that we reconsider the lower

———

[1] Bellevue School District Appeal, 218 Pa. Superior Ct. 702, 272 A. 2d 225 (1970); Braddock School District Appeal, 218 Pa. Superior Ct. 702, 272 A. 2d 267 (1970); Coraopolis Borough School District Appeal, 218 Pa. Superior Ct. 743, 272 A. 2d 231 (1970); East Pittsburgh School District Appeal, 218 Pa. Superior Ct. 741, 272 A. 2d 215 (1970); Moon Schools Union School District Appeal, 218 Pa. Superior Ct. 743, 272 A. 2d 206 (1970); Munhall School District Appeal, 218 Pa. Superior Ct. 744, 272 A. 2d 253 (1970); Neville Township School District Appeal, 218 Pa. Superior Ct. 743, 272 A. 2d 233 (1970); North Braddock School District Appeal, 218 Pa. Superior Ct. 745, 272 A. 2d 220 (1970); West Homestead School District Appeal, 218 Pa. Superior Ct. 749, 272 A. 2d 262 (1970).

court's exercise of discretion in this case. The petition was granted, and the case was reargued on March 8, 1971. I am now convinced that the lower court erred in this case and am dissenting from the action of the majority in again affirming the lower court's order.

That part of the plan submitted by the Allegheny County Board of School Directors to the State Board of Education which is involved in this case provided for Unit 38, comprised of the School Districts of the Boroughs of Swissvale and Braddock Hills, which since 1965 have operated as a jointure under the name of "Swissvale and Area Joint Schools"; and Unit 40, comprised of the School District of the Borough of Edgewood, which has been an independent school district of long standing. Braddock Hills School District (Braddock Hills), appealed to the State Board, praying that Unit 40 be included within Unit 38. The State Board permitted Edgewood to intervene; a hearing was held at which both Edgewood and Braddock Hills offered testimony; and the State Board, after making findings of fact, affirmed the plan of the Allegheny County Board of School Directors. On appeal to the Court of Common Pleas by Braddock Hills, a hearing was held before the Honorable J. Frank McKenna, Jr., who heard additional testimony and ordered Unit 40 abolished and Edgewood to be included in Unit 38. This appeal by Edgewood followed.

There are legal and procedural issues involved in this case that were not fully developed in the other school appeals argued before us on November 12, 1970, primarily for the reason that this is the only case in which, having decided that the State Board of Education had erred in its adjudication of adopting the plan formulated by the Allegheny County Board of School Directors, the lower court exercised its own discretion, a power given it under the Pennsylvania School Reor-

ganization Act of 1968, supra. In the other cases, in affirming the State Board of Education, the lower court reviewed the exercise of discretion by the Board and refrained to exercise its own discretion. In its opinion in the case of *East Pittsburgh School District Appeal*, 218 Pa. Superior Ct. 741, 272 A. 2d 215 (1970), the lower court stated, "However, the Court is not a super Board of Education, nor does it have the knowledge or the data possessed by the State Board which would enable it to create better administrative units than did the County in the first instance and the State finally."

It is apparent in this case that the lower court interpreted Act 150 as giving the State Board far less a range of discretion in school reorganization than the State Board has been exercising in these cases. In that aspect this case requires our review. Additionally, Act 150 provides for a unique procedure for review of the State Board's discretion. The act provides for preparation of a plan of organization of certain school districts in each County by the County Board of School Directors and its submission to the State Board of Education. Section 3 of Act 150 provides: "The State Board of Education shall review all plans and approve such plans as it deems wise in the best interests of the educational system of the Commonwealth. No plan of organization of administrative units shall be approved in which any proposed school district contains a pupil population of less than four thousand (4,000), unless when factors of topography, pupil population, community characteristics, transportation of pupils, use of existing school buildings, existing administrative units, potential population changes and the capability of providing a comprehensive program of education are considered by the State Board of Education as requiring the approval of a plan of organization of administra-

tive units in which one or more proposed school districts contains a pupil population of less than four thousand (4,000)." Section 5 of the Act provides: "Any school district which considers itself aggrieved by a plan of organization of administrative units approved by the State Board of Education under this act shall have the right to appeal therefrom . . . to the court of common pleas . . . by petition setting forth that such approval is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, specifying the grounds upon which it relies. . . .

"The court, after hearing such additional testimony as the parties may wish to present and a consideration of the entire record, shall enter an order either affirming the plan as approved by the State Board of Education or an order making such amendments to the plan as the court, in its discretion, shall find necessary or advisable. The order of the court shall be a final order."

Based upon the evidence in the record at the hearing before it, the State Board made findings of fact concerning both Unit 38 and Unit 40, significantly, as follows:

"2. For 1966-1967 the ADM [average daily pupil membership] for Unit 38 was 2,286 and the ADM for Unit 40 was 928. (County Plan)

"4. Both Units 38 and 40 offer full programs of instruction, kindergarten through grade twelve (County Plan).

"5. Approximately 85% of the Edgewood graduating class go on to college or degree granting institutions, whereas only 50% of the Swissvale graduates attend degree granting institutions. (N.T. 51 and 83)

"6. Edgewood offers a comprehensive program of quality education, K-12, providing for all its students individualized guidance and scheduling (N.T. 81-86, 140; Edgewood Exhibit 1).

"9. The secondary program presently offered in Unit 38 is accredited by the Middle States Association. (N.T. 194)."

According to its findings, the State Board admitted that neither Unit 38 nor Unit 40 approached the 4,000 figure for pupil attendance; however, it justified the approval of both units on the basis that both units were capable of offering a comprehensive program of education. The lower court overruled the State Board on these findings for two reasons. First, the lower court found that there was not substantial evidence in the record to support the findings that the units offered or were capable of offering a comprehensive program of quality education. Secondly, the lower court held that, even if the units did offer a comprehensive program of quality education, such a finding cannot justify the State Board's approval of a unit containing less than 4,000 students. In so ruling the lower court stated, "Further, it has never, in any other case, been suggested that just because a district is presently offering a comprehensive plan, it should not be merged with other districts.[2] The State law mandates a pupil population of at least 4,000 pupils. . . . The State is committed to the principle that the larger districts will operate more efficiently than the smaller ones. Thus, regardless of our own view, the law compels a decision herein in favor of the merger."

I disagree with the lower court on both of the latter points. First, I believe that the record discloses ample evidence before the State Board on which can be sustained their findings that both units are capable

[2] I believe, on the contrary, that this issue was raised either directly or indirectly by a majority of the School Districts in their appeals to the lower court. Also see the record in the case of *East Pittsburgh School District Appeal,* supra, in which the issue was directly raised on appeal to both the lower court and this Court.

of offering a comprehensive program of quality education.

The complete or comprehensive education has been a subject of much controversy through the ages and remains undefined even today. The General Assembly of Pennsylvania has not defined it but has left it in the hands of the State Board of Education. Under the mandate of Act 150, the State Board made an unsatisfactory attempt at definition by adopting on July 11, 1968, "Standards for Approval of Administrative Units," pertinent excerpts from which follow.

"4. An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities, and interests of individual residing in the administrative unit.

"7.h. *Capability of Providing a Comprehensive Program of Education.* For purposes of reorganization planning, 'capability of providing a comprehensive program of education' shall mean: The ability to educate and train each child within his capacity to the extent demanded by the immediate requirements of his growth and his relationship to the strengthening of this Commonwealth and nation, and, shall include, but not be limited to, wealth per pupil, qualifications of professional staff, enrollment and diversification of curricula." There is no contention by the parties that the elementary schools in these two units are not offering now or are incapable of offering all the educational subjects required by the State Board. Braddock Hills' primary contention is that a combination of the two units will allow an offering of a greater variety of elective courses to all the high school students as well as more services to all students. Indeed, Dr. James S. Snoke, Assistant Superintendent of Allegheny County Schools, testifying in behalf of Braddock Hills, ap-

proved the philosophy of the State Board apparently currently being promulgated in our public schools, that only a limited number of courses are required to be taken, most courses being elective. He stated, "I think all subjects in the secondary school, exclusive of English and social studies and physical education ought to be elective, so that any child or young person who wants to pursue a language course in one situation should be able to take a language. If he wants to specialize to the field of mathematics and science, he ought to be able to elect those. If he wants to elect courses that will fit him in the technological area, he ought to be able to select those so that it would be convenient for him to add to the general humanities, opportunities for him to extend his education in any direction that he has an interest and a capability." Therefore, since the number and quality of elective courses and services that a school system should offer to its students has been left by the General Assembly entirely within the discretion of the State Board and is subject to periodic change by the State Board, there are little or no standards available by which the State Board's discretion can be judged. However, the evidence demonstrates that Edgewood offers wide services to its students, has an extensive high school curricula, and has an impressive scholastic record. John R. Dunlap, Jr., acting supervising principal of Edgewood School District, testified before the State Board, as follows: "Presently, the Edgewood School District consists of two adjacent buildings which are located in the geographical center of the borough. The elementary school is a two-story brick building containing thirteen regular classrooms. It has one kindergarten, a medical suite, a gym, a full time library and administrative suite. It was renovated completely on the inside in 1955 and '56. The following were added: One audi-

torium, one gymnasium, music room, art room, business education room, two science labs, two home economics labs, two industrial arts shops, one library, two conference rooms and an administrative suite. . . . [The school staff] has increased since 1965. We have fifty-four full time and part time regular teachers. We have one full time guidance director in the high school. We have two full time librarians. We have a full time reading specialist, and a full time nurse. Three school administrators, three secretaries and one bookkeeper. Approximately 65 per cent of our personnel hold master's degrees or better. The average teaching experience in our borough runs approximately ten years. The teacher ratio is approximately twenty to one. . . . [Since 1965] We have established a high school library, bringing it up to date. We have also staffed this with two full time certified librarians, both at the elementary school and the high school. We still have on our staff a part time fully certified school librarian that also works in the public library. . . . We have included instrumental music for grades four through seven. . . . We have developed an orchestra string unit. We have developed driver education. We have added a reading specialist. We have extended our advanced placement. Geometry and trigonometry has been increased. We are now participating with Forbes Technical School, the Eastern School for the Retarded. We have instituted summer programs and also a summer typing class for fifth and sixth graders." He further testified that approximately 85 per cent of the Edgewood students proceed to acquire higher education.

Braddock Hills does not seriously contend in this case that Unit 38 does not offer a variety and quality of curricula and services equal to or exceeding those of Edgewood. And the record supports the finding of the State Board that both units are financially able to support their present system.

Therefore, I can find no basis for a finding that the State Board abused its discretion in this case and believe that the lower court erred in so finding.

Secondly, I believe that it is irrelevant in this case that the purpose of the General Assembly in enacting Act 150 may or may not have been to achieve a unit with a pupil size of 4,000; and whether there is validity in the presumption that the larger the pupil size, the more capable is the district to offer quality education, is also irrelevant. In spite of those alleged goals and principles, Act 150 permits the State Board to allow or to form units with less than 4,000 pupils where it finds the capability of providing a comprehensive program of education; Act 150 reposes that amount of discretion in the State Board. It is my interpretation that the State Board, in exercising that discretion, has the right to ignore the fact that any one smaller unit may be capable of providing a comprehensive program of education and force it to merge with other units; but, on the other hand, it may also exercise its discretion to allow any one unit so capable to remain alone, as it did in this case.

The final issue in this appeal is whether Act 150 empowers the lower court to ignore the findings of the State Board and make its own findings, when it cannot be shown that the Board has acted arbitrarily, capriciously, or otherwise misapplied the law. I believe that the lower court was powerless to do so in this case. I do not interpret Act 150 to give the lower court the absolute right to consider the case de novo similar to the power this Court exercises in divorce appeals. Act 150 clearly provides that the State Board is first required to adjudicate the matter; and more importantly, an appeal can be taken from its adjudication to the court of common pleas if the State Board's action is "arbitrary, capricious, an abuse of discretion, or other-

wise not in accordance with law." Thus, it is the lower court's first duty to rule on those questions and only after the lower court properly decides that the action of the State Board is arbitrary, capricious, etc., can it proceed to review the whole record and exercise its own discretion. In this respect Act 150 appears to be unique since it does not require the return of the case to the administrative agency, as would occur in a workmen's compensation case, after the reviewing court finds an arbitrary or capricious abuse of discretion or an error of law. Since it is my opinion that the lower court erred in finding an abuse of discretion and a misapplication of the law by the State Board, I believe that it was without power to proceed further by exercising its own discretion. There is no contention of any other irregularity occurring before the State Board in this case that would require a rehearing or new evidence. The court itself stated in its opinion, "The evidence produced before the Court on March 16, 1970 added little of substance to the record." It is important to note that no testimony was offered at the hearing before the court by Braddock Hills pertaining to the most vital question in this case, as to whether the units involved were capable of offering a comprehensive program of education; therefore, there was nothing new in the record to be adjudicated by the lower court.

Since the State Board's findings were based on substantial evidence, the State Board properly applied the law thereto and properly exercised its discretion, and no further material evidence was offered upon which the lower court could exercise its independent discretion, I agree with Edgewood's contention that the lower court was without legal justification to substitute its discretion for the State Board's, and I therefore respectfully dissent.

CERCONE, J., joins in this dissenting opinion.